**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ANDREA SMOLEK, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: |
| v. | CLASS ACTION COMPLAINT |
| HYUNDAI MOTOR AMERICA and KIA MOTORS AMERICA, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Andrea Smolek, individually and on behalf of all others similarly situated, brings this class action against Defendants Hyundai Motor America ("HMA") and Kia Motors America, Inc. ("KMA") (collectively, "Defendants").

**SUMMARY OF THE ACTION**

1.      This consumer class action arises from defective Theta II engines found in hundreds of thousands of Hyundai and Kia vehicles in the United States.

2.      The Theta II engine's fuel injection system causes contaminants to enter the engine's oil supply. Initial symptoms of the Defect include a knocking noise from the engine, a reduction in engine power, and engine stalling events (the "Defect"). When the level of contaminants in the oil supply sufficiently thicken the Theta II engine's oil supply, the engine fails, leading to an immediate loss of engine power and power steering.  The Defect thus creates a safety hazard for not only the vehicle's occupants but the occupants of nearby vehicles. Countless consumer complaints to Hyundai, Kia and traffic safety authorities detail the safety risks and economic burdens of vehicles prone to total and unexpected engine failure.

1

3.      The only remedy for the Defect is replacing the engine with another defective Theta II engine. Though the Defect is covered by Defendants' written 10-year, 100,000 mile powertrain warranties, Defendants routinely deny warranty coverage to engines consumed by the Defect by blaming the engine-killing oil sludge on inadequate maintenance or the use of aftermarket oil filters.

4.      Between 2015 and 2017, Defendants recalled 1.5 million vehicles with Theta II engines in North America. Each recall addressed knocking noises, engine stalls, and sudden engine failures. Though the recalls cover Theta II engines manufactured over a five-year period in at least two continents, in each instance, Defendants attributed the recall to the same underlying cause: leftover metal debris in the engine from the manufacturing process.

5.      Reports suggest that in 2016, a Hyundai engineer informed the National Highway Traffic Safety Administration ("NHTSA") that Defendants have long been aware that the Theta II engines possess a design flaw affecting all Theta II engines. These reports are consistent with the experience of Plaintiff and countless other owners and lessees of vehicles with defective Theta II engines that have not been recalled (the "Class Vehicles"). Non-recalled Theta II engines are failing because of the Defect in numbers that in some cases exceed the failure rates of recalled vehicles.

6.      This case seeks protection and relief for owners of the Class Vehicles for the harm they have suffered, and the safety risks they face, from Defendants' unfair, unlawful, and deceptive trade practices.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this action under the Class Action

Fairness Act, 28 U.S.C. § 1332(d).  There are more than 100 class members, and their

aggregated claims exceed $5,000,000, exclusive of interests and costs.  This is a putative class

action in which the proposed class members are citizens of a state other than the state in which

Defendants are deemed to reside. This Court has supplemental jurisdiction over state law

claims pursuant to 28 U.S.C. § 1367.

8.      This Court has personal jurisdiction over Plaintiff, Andrea Smolek, because she

resides in this district and because she submits to the Court's jurisdiction.

9.      Venue is proper in this Court because Plaintiff purchased her Kia Sorento in this

district and the engine of Plaintiff's vehicle failed on a highway in this district.

10.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391 because

Defendants transact business through authorized dealers, advertise in this district, and

generate substantial revenues from Class Vehicles in this district.

**PARTIES**

I.    **Plaintiff**

11.     Plaintiff Andrea Smolek is a citizen of Illinois residing in Villa Park, Illinois.  In

October 31, 2014, Plaintiff purchased a new 2015 Kia Sorento LX from Ed Napleton's Kia of

Elmhurst in Elmhurst, Illinois.

II.   **Defendants**

12.     Defendant Hyundai Motor America ("HMA") is a California corporation

headquartered in Fountain Valley, California. HMA is a subsidiary of Defendant Hyundai Motor

Company. At all relevant times, HMA was involved in the design, manufacture, assembly, marketing, distribution and sale of Affected Hyundai Vehicles sold in the United States.

13.    Hyundai Motor Company ("HMC") is a Korean corporation headquartered in Seoul, South Korea. HMC is the parent corporation of HMA. HMC also owns a more than 33% stake in Defendant Kia Motors Corporation.

14.    Defendant Kia Motors America ("KMA") is a California corporation headquartered in Irvine, California. A subsidiary of Defendant Kia Motors Corporation, KMA was actively involved in the design, manufacture, assembly, marketing, distribution, and sale of Affected Kia Vehicles sold in the United States.

15.    Kia Motors Corporation ("KMC") is a South Korean corporation headquartered in Seoul, South Korea. KMC is the parent of KMA.

**FACTS SPECIFIC TO PLAINTIFF**

16.    In October 31, 2014, Plaintiff Andrea Smolek and her husband jointly purchased a new 2015 Kia Sorento LX with a 2.4L Theta II engine from Ed Napleton's Kia of Elmhurst in Elmhurst, Illinois.

17.    In April 2016, Plaintiff was driving on a local highway when she heard a series of loud sounds from her Sorento's engine compartment, punctuated by a loud bang, the violent shaking of her vehicle, and the illumination of the check engine light on the instrument panel.

18.    Plaintiff towed her vehicle to Bob Rohrman Kia in Schaumburg, Illinois, where a technician opened the crankcase of her engine and found that the oil in her engine had turned to sludge. Kia requested Plaintiff's oil change records, which she promptly provided, and which show that Plaintiff changed her vehicle's oil in accordance with Kia's recommendations. After

4

receiving the records, a Kia technician told Plaintiff that he believed the oil had never been changed in her vehicle and that her claim was being submitted to Kia for approval.

19.     Kia denied Plaintiff's warranty claim. When Plaintiff protested, Rohrman Kia told Plaintiff that they could inspect her engine but would charge her $1,000 if they did not find a defect in the engine. An employee of Rohrman Kia also told Plaintiff that if she did not have her engine replaced before leaving the dealership, any powertrain warranty remaining on her vehicle would be voided.

20.     Feeling that she had no choice, Plaintiff purchased a refurbished engine from Bob Rohrman Kia for $6,000 including installation costs.  To pay for the engine, Plaintiff was forced to take out two high-interest loans, which she is still repaying to this day.

## COMMON FACTUAL ALLEGATIONS

**I.      Background on Defendants Hyundai and Kia**

21.     Defendants, in conjunction with their respective parent companies, Hyundai Motor Corporation and Kia Motor Corporation, jointly design, manufacture, distribute, warranty, and service passenger vehicles for sale across world, including in the United States.

22.     Hyundai Motor Corporation, a multinational corporation with nearly 80,000 employees, is the fourth-largest automobile manufacturer in the world. More than half of Hyundai passenger vehicles sold worldwide are sold in the United States. Headquartered in Fountain Valley, California, Hyundai Motor America manages American sales, marketing and distribution of Hyundai vehicles and employs more than 32,000 people.

23.     Kia Motor Corporation is a South Korean company that manufactures and sells passenger vehicles, recreational vehicles, and commercial vehicles throughout the world. More than a third of Kia Motor Corporation's stock is held by Hyundai Motor Corporation.

24.     Headquartered in Irvine, California, where Kia's American marketing, warranty, and distribution functions are managed, Kia Motors America oversees nearly 800 authorized dealers in the United States.

25.     Hyundai and Kia share testing facilities and equipment in California City, California, where Defendants conduct pre-sale durability testing, among other things.

26.     On information and belief, Defendants were at all relevant times acting as agents or employees of each other and their parent companies and were acting within the scope of their agency or employment, with the knowledge, permission, or consent of the other Defendants. The acts or omissions described herein were known by and ratified by each of the other Defendants.

**II.     Timeline of Defendants' GDI Engine**

27.     In 2009, Defendants' announced their first line of Gasoline Direct Injection (GDI) engines in the United States, the Theta II engines. The Theta II engines consisted of a turbocharged 2.0-liter model and a naturally aspirated 2.4-liter model. HMA used Theta II GDI engines in certain Sonata and Santa Fe SUVs. Kia used Theta II engines in certain Optima, Sorento, and Sportage vehicles.

28.     In 2012, Defendants introduced another GDI engine to its lineup. A 2.0L GDI engine was unveiled as part of Defendants' Nu engine line. That same year, Kia began using the GDI Nu engine, which it eventually added to certain Soul, Forte EX, Sportage, Optima, and

Sonata Hybrid vehicles. Hyundai used the Nu GDI engine in certain Elantra and Sonata Hybrid vehicles.

29. In 2012, Defendants also added GDI engines to their Lambda II engine lineup with a 3.0L GDI engine, a 3.3L GDI engine, and a turbocharged 3.3L GDI engine. Hyundai used the Lambda II GDI engines in certain Genesis and Santa Fe vehicles. In 2014, Kia began using Lambda II engines in certain Sedona, Cadenza, and Sorento vehicles.

III. **Defendants' Theta II GDI engines**

30. The defect described herein relates to the operation and design of the Theta II fuel injection systems within each engine's combustion chambers.

31. Like most passenger vehicle engines, Theta II engines power a vehicle's wheels by igniting fuel in combustion chambers. Oxygen enters the combustion chamber through an air intake valve ("I" in the diagram below), where it is mixed with fuel sprayed from an injector. The fuel-air mixture's ignition by a sparkplug ("S") causes a rapid increase in pressure, which pushes a piston ("P") sitting in a cylinder at the bottom of combustion chamber. The piston's movement is converted into rotational force by a connecting rod ("R"), which in turn rotates the crankshaft ("C") powering the wheels. The rotation of the crankshaft by the downward movement of one piston causes a reciprocal upwards movement of one of the engine's other pistons. As a piston moves up in the cylinder, an exhaust valve ("E") opens, and exhaust gases are pushed into the exhaust system. Air and fuel then enter the chamber, where they are compressed by the upward moving piston and ignited by the sparkplug.



32.     In order for the combustion of fuel and air to create enough pressure to move

the piston, an airtight combustion chamber is necessary.  The valves ("V") in the combustion

chamber close during combustion, preventing gasses from escaping upwards. So that

combusted gasses do not escape downward past the piston and into the case containing the

engine's crank (the "crankcase"), a tight seal is needed between the piston and cylinder walls,

which is formed using a series of piston rings that are placed in cutout grooves circumscribing

the piston. The piston seals serve additional functions, including the prevention of prevent oil,

contaminants, and byproducts of combustion from escaping into the crankcase.



33.     During normal operation, engine oil, circulated by an oil pump, lubricates the

rapidly moving piston, connecting rod, and the bearings connecting the connecting rod to the

crankshaft, as well as other moving engine components. As the oil circulates through the engine

by an oil pump, it is cleaned of contaminants by an oil filter.

34.     The central physical distinction between GDI engines and traditional port fuel

injection (PFI) engines is the manner in which fuel is injected into the combustion chamber.

Fuel injectors in PFI engines are positioned outside of the combustion chamber and are sucked

into the combustion chamber by a retreating piston. GDI engines, by contrast, spray fuel

directly into the combustion chamber using pressure of up to 1,935 psi to ensure fuel proper

distribution in the chamber.



35. In PFI engines, fuel sprayed from PFI injectors passes over the chamber's intake valve as the piston retreats. Because GDI engines inject fuel directly in to the combustion chamber, GDI intake valves do not get sprayed with fuel.

36. The detergents contained in fuel clean the PFI engine's intake valves, preventing the accumulation of oil, byproducts of the combustion process, and other contaminants.

37. Defendants' Theta II engines do not spray fuel over the engine's intake valves. As a result, detergent-laden fuel does not wash the intake valves, leading to carbon buildup on the Theta II engines' intake valves, which dislodges and falls into the combustion chamber.



*Carbon buildup on intake valve*

38.     Over time, some carbon buildup on or around the intake valve dislodges and falls into the engine's combustion chamber. This is doubly problematic in GDI engines, which tend to generate more soot than PFI engines.

39.     Theta II engines compress the air-fuel mixture in the combustion chamber to much higher pressures than PFI engines. This increase in pressure leads to a corresponding increase in operating temperatures. The combination of high pressure and high heat in Theta II engines makes them particularly susceptible to "blow by," which occurs when the pressure generated by the combustion process forces fuel, air, moisture, and other contaminants past the piston rings and into the crankcase.

40.      In order to manage engine temperatures, Defendants' Theta II engines spray a mist of engine oil onto the pistons, increasing oil temperatures and introducing atomized engine oil into the engine gasses. This process causes oil vapors to pass over the intake valves.

41.     Over time, soot, oil particulates, and other contaminants attach to the Theta II engine's intake valve and valve walls.

11

42.     In the short term, the buildup of oil and other contaminants on the intake valves reduces engine performance and fuel economy. Eventually, however, the buildup dislodges from the valves and falls onto the piston head in the combustion chamber. The high pressures needed for GDI combustion forces the dislodged buildup down against the engine's piston and piston rings. As the particulates stick to the piston seal's ring, they create microscopic grooves in the cylinder walls, creating gaps for more dislodged buildup to move from the intake valve into the engine's oil.

43.     The dislodged carbon buildup contaminates the engine's oil, creating a particulate-filled oil sludge. Pumping oil sludge through the engine's oil ports causes the ports to clog, leading to restricted oil flow ("oil starvation"). Moving parts in the engine that are starved of oil begin to rub directly on each other. This metal-on-metal contact creates metal shavings that combine with the oil sludge, leading to even more oil starvation and, eventually, engine failure.

44.     As Defendants have acknowledged in their recall notices related to GDI engine failures, "an engine stall at higher speeds can increase the risk of a crash." See NHTSA Recall No. 17V-224, 2 (Kia); NHTSA Recall No. 17v-226, 2 (Hyundai).

45.     The most common failures in Theta II engines occur right where one might expect them to be: directly beneath the piston. Specifically, the bearings connecting the piston's connecting rod shaft to the crankshaft sit in the direct line of fire for contaminants entering the crankcase from the combustion chamber. These bearings seize at a high rate, causing total engine failure, which is often precipitated by engine stalling, an engine knocking

12

noise, a reduction in engine power, or a check oil lamp illuminating on the Class Vehicle's instrument panel.

46.     The only remedy for an engine rendered inoperable by the Defect is a new engine, which can cost up to $10,000 to purchase and install.

### IV.     Defendants' Knowledge of the Defect

47.     Defendants have been aware of the defect affecting its GDI engines for years. Defendants have also been aware that an unexpected engine failure puts at risk the safety of the vehicle's driver and passengers as well as the safety of other drivers and passengers.

48.     Defendants issued a 2012 Technical Service Bulletin to dealership technicians regarding a defect causing engine knocking noises in Theta II engines. Rather than accepting responsibility, KMA and HMA blamed the problem on the use of aftermarket oil filters commonly used in oil change shops and instructed dealers to replace the oil filter and charge the owner for the filter and labor.

49.     Consistent with its approach of blaming the customer, starting in 2012, Defendants' owner manuals began requiring the addition of fuel additives to each vehicle's gas tank with every oil change. The additive Hyundai recommends is a fuel system cleaner intended to prevent or reduce the buildup of carbon in the fuel injectors, intake valves, and combustion chambers. On information and belief, the additive was recommended in response to the "engine knock" defect, which was the subject of the 2012 TSB.

50.     Though HMA and KMA have received thousands of complaints about the engine defects, until and unless they perform a recall, they consistently deny warranty claims for engines destroyed by the oil starvation defect described herein. HMA and KMA routinely reject

warranty claims for the defect if the vehicle's owner cannot furnish records of timely oil changes or of other service records.

51.     Defendants' internal records of customer complaints, warranty claim information, and engineering and durability reports also put Defendants on notice of the defect described herein. Defendants also have received a number of complaints through the National Highway Traffic Safety Administration (NHTSA) regarding the defect in a variety of GDI engines.

**V.      The NHTSA Recalls of Theta II Vehicle's, Hyundai's Whistleblower, and NHTSA's current investigation of the adequacy of Defendants' recalls.**

52.     To date, Defendants have recalled approximately 1.5 million vehicles containing Theta II engines in the United States. In each recall, which span Theta II engines manufactured in at least three different manufacturing facilities over a five-year period, KMA and KMC have blamed nearly identical manufacturing defects. In each recall, KMA or KMC allege that the defect affects only 2% of recalled vehicles and that steps have been taken to remedy the defect.

**A.      Hyundai's September 10, 2015 recall of Theta II Sonata cars**

53.     On September 10, 2015, Hyundai issued a NHTSA recall of 470,000 Model Year 2011 and 2012 Sonatas with 2.0L and 2.4L Theta II engines manufactured in Hyundai's Alabama plant between December 11, 2009 and April 12, 2012. NHTSA Recall No. 15V-568. Hyundai reported "that metal debris *may* have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during the subject production period." (emphasis added). Hyundai determined that metal debris caused a reduction of oil flow and premature engine wear, particularly in the engine's bearings, which can cause a "metallic, cyclic knocking noise which increases in frequency as the engine rpm increases" or illumination of the

14

oil pressure lamp on the instrument panel. Hyundai concluded that the failure of a bearing can cause an affected vehicle to "stall while in motion."

54.     Hyundai estimated that 2% of recalled vehicles possessed the defect, which it attributed to manufacturing hiccups at its brand-new Alabama plant. Specifically, HMA blamed an ineffective mechanical deburring process that its Alabama plant used to remove machining debris from the engine prior to assembly. In order to prevent the issue from recurring, Hyundai reported that it had switched to a high-pressure "wet blast" process for removing debris from the engines.

### B.     The August 2016 Hyundai Whistleblower

55.     According to Reuters, Kim Gwang-ho, then an engineer at Hyundai, travelled to Washington D.C. in August 2016 to inform NHTSA that more vehicles should have been recalled over the defects described herein. He also reported several safety issues to NHTSA authorities.

56.     Mr. Kim reported to Reuters that he provided NHTSA with 250 pages of internal documents related to the alleged engine defect, which he described as a design issue instead of a manufacturing problem. Citing an internal report from Hyundai's Quality Strategy team, Mr. Kim reported that "the problem was not just with the manufacturing process but also engine design, meaning Hyundai would need to fix engines in all the affected cars, at a steep cost." https://www.reuters.com/article/us-hyundai-whistleblower/blowing-the-whistle-in-south-korea-hyundai-man-takes-on-chaebol-culture-idUSKCN18B0J5 (last visited Mar. 24, 2018).

57.     Reuters reported that Hyundai obtained an injunction preventing Reuters from obtaining the documents Mr. Kim provided to NHTSA.

**C.      Kia's March 31, 2017 recall of Theta II Optima cars and Sorento SUVs**

58.      On March 31, 2017, KMA issued a NHTSA recall covering 618,160 Kia Optima and

Sorento vehicles containing Theta II GDI engines. NHTSA Recall No. 17v-224.

59.      The Optima recall covered 443,825 vehicles for model years 2011 through 2013

with 2.0L turbocharged Theta II GDI engines that were produced between August 10, 2010 and

September 27, 2013. Kia also recalled model year 2014 Kia Optimas with 2.4L Theta II engines

produced in Hyundai's Alabama plant between August 28, 2013 and May 15, 2014.

60.      The Sorento recall covered covered 165,918 Sorentos containing 2.4L Theta II

GDI engines for model years 2012 through 2014, which were produced between April 19, 2011

through February 10, 2014.

61.      Though the recalled GDI engines were manufactured Kia's Hwaseong facility in

Seoul and in Hyundai's Alabama plant after its manufacturing process improvements in 2012,

Kia attributed the Theta II GDI engine recall to the same manufacturing defects and leftover

debris theory described in Hyundai's 2015 recall. Kia noted that metal debris "may" have been

left over from the engine machining process, restricting oil flow and causing premature engine

wear, engine knock, and illumination of the oil pressure lamp on the instrument panel. Kia also

attributed the defects to uneven engine surfaces created during machining, which could further

restrict oil flow within the engines. Kia estimated that 2% of the recalled vehicles were affected

by this defect.

62.      Kia reported that it had taken two remedial measures: "engine plant

processes/operations were improved in August 2013 at the Hwasung plant and during the

production of the 2014 model year at the Hyundai Motor Manufacturing Alabama plant."

16

**D.** **Hyundai's March 31, 2017 recall of Theta II Santa Fe Sport SUVs and Sonatas**

63. On March 31, 2017, Hyundai recalled 572,000 Sonata and Santa Fe Sport vehicles containing Theta II GDI engines.

64. The Sonata recall covered model year 2013 and 2014 Sonatas with 2.0L or 2.4L Theta II GDI engines manufactured in Hyundai's Alabama plant between March 21, 2012 and May 29, 2013.

65. The Santa Fe Sport recall covered model year 2013 and 2014 Santa Fe Sport vehicles with 2.0L or 2.4L engines produced at Kia Motor Manufacturing Georgia.

66. Again, Hyundai attributed leftover machining debris as the cause of engine knocking noise, premature bearing wear, illumination of the oil pressure lamp in the instrument panel, reduced engine power or hesitation, and the loss of "motive power while in motion." Hyundai described the safety risk posed by engine failures as follows: "An engine stall at higher speeds can increase the risk of a crash." Hyundai estimated that 2% of recalled vehicles were affected by the defect.

67. Hyundai noted that it had again revised its manufacturing processes.

**E.** **NHTSA's 2017 Investigation of Hyundai and Kia's Recalls**

68. On May 18, 2017, NHTSA opened parallel investigations into the "scope and timeliness" of Defendants' recalls.

69. NHTSA opened its 2017 Kia investigation (No. RQ 17-003) to investigate both the timeliness and scope of Kia's Theta II engine recall and Kia's compliance with NHTSA reporting requirements. NHTSA noted that in 2015, Kia did not follow Hyundai in recalling Theta II GDI on the basis that Kia's engines were manufactured on different production lines than Hyundai's,

which covered only vehicles manufactured in Hyundai's Alabama plant. NHTSA's investigation was apparently triggered by Kia's 2017 recall, which covered several hundred thousand vehicles that were manufactured in Hyundai's Alabama plant, and the fact that the 2017 recalls by Hyundai and Kia were not plant-specific and covered vehicles manufactured in Seoul, Alabama, and Georgia.

70.     NHTSA opened its 2017 Hyundai investigation to investigate the timeliness and scope of Hyundai's Theta II GDI engine recalls and Hyundai's compliance with reporting requirements. NHTSA Investigation No. RQ 17-004.

71.     NHTSA noted that Hyundai's 2015 recall described the defect as one involving manufacturing issues that Hyundai said it had resolved in 2012, but that Hyundai's 2017 recall, which was again attributed to manufacturing defects, "continue[d] to describe the defect as an issue involving manufacturing debris."

72.     NHTSA's investigations into Defendants are ongoing to this day.

**VI.    Defendants' recalls address only a fraction of defective Theta II engines on the road**

**A.    Theta II engines in unrecalled 2015 Kia Optimas are failing at a high rate**

73.     As detailed above, in March 2017, Kia recalled Theta II GDI Optimas for model years 2011 through 2014. The basis for that recall was potential engine manufacturing defects in Hyundai's Alabama plant, which Hyundai said it remedied in 2012.

74.     NHTSA's complaint database reveals that the 2015 Optimas, which were not recalled, have been the subject of almost exactly the same number of engine complaints as the 2014 Optimas, which have been recalled. The recalled 2014 Optimas are the subject of 49

NHTSA complaints related to engine issues; the not-recalled 2015 Optimas are the subject of 46

NHTSA complaints related to engine issues.

75.     The NHTSA engine complaints for 2015 Optimas, a sampling of which are

provided below, report the same engine knock, engine stalling, and engine failure events

detailed in Defendants' 2015 and 2017 recalls:

| Model | MY | Comment |
| --- | --- | --- |
| Hyundai Optima | 2015 | The car engine died one day when I was driving up a hill in heavy rain on a very busy two way street with four lanes across. We're lucky we weren't injured because other cars coming up behind us couldn't see that well in the rain. There was never any knocking or indication of anything wrong. It just died out of the blue. We took it to Kia and they said the engine seized due to sludge. I had to get the engine rebuilt on my own dime ($3000 plus towing etc.) because Kia refused to honor the warranty. The car was only about a year old at that point. They told me I had to give them all receipts showing oil changes etc. And even when I brought the receipts they said it wasn't enough and that it was my fault. Not to mention Kia has already recalled this same engine in earlier models and it's the same engine (theta II) that is in the huyundai sonata which was also recalled for seizing/sludge. It is pretty obvious this engine is faulty and Kia needs to recall it but they aren't including this 2015 in the recall with the 2014, 2013 and 2012 models. |
| Hyundai Optima | 2015 | The engine began making a knocking noise, then stalled. Upon inspection at auto shop it was discovered that the engine seized and was a complete fail. The vehicle was traveling on a highway at around 65 miles per hour. The car has had all preventative maintenance performed and I can provide documentation as to that. |
| Hyundai Optima | 2015 | While driving the vehicle, the power cut off, - coasted to a complete stop. Engine does not turn over. Lights/radio etc all work, so not a battery issue. There is a recall for previous model years of this same vehicle specific to engine failure. |
| Hyundai Optima | 2015 | The Optima has stalled multiple times while driving on both the highway and city streets. When the car stalls everything shuts off completely and it's is extremely difficult to steer. My 2 year old daughter has been in the car during rush hour traffic a couple times while this has happened. I have called both Kia corporate and the Kia dealership where the was purchased and they can't figure out why the car is stalling. After 3-5 weeks of going |

back and forth with the Kia corporate and the dealership they have finally told me there is nothing they can do.

**B.    Theta II engines in unrecalled Hyundai Sonatas are failing at a higher rate than recalled Sonatas**

76.    Hyundai's Sonata recall in 2015 covered all model year 2011 and 2012 Sonatas with Theta II GDI engines manufactured in Hyundai's Alabama plant.  Hyundai's second 2017, covered model year 2013 and 2014 Sonatas with Theta II GDI engines manufactured in Hyundai's Alabama plant.

77.    In both recalls, Hyundai attributed knocking, stalling, and engine bearing failures to leftover machining debris in the engines.

78.    The 2015 Sonatas, which contain un-recalled Theta II GDI engines have been the subject of more than 100 engine complaints on NHTSA, whereas only 62 complaints have been filed for the recalled 2014 Sonatas.

| Model | MY | Comment |
|---|---|---|
| Hyundai Sonata | 2015 | Blown engine, bought 2015 Sonata with 36,000 miles, certified used, leased car. Driving home about 35 mph, the engine made a loud clunking sound, thankfully I was in the right lane, I pulled off the street into a parking lot when all of a sudden the car engine blew. Had to tow back to the dealership where they are to replace the engine. Hyundai usa needs send out recall for the gti engine that is causing a lot of issues. |
| Hyundai Sonata | 2015 | The vehicle began making a knocking noise while driving up the mountain to big bear. No warning lights illuminated on the dash. Two days later while descending the mountain, the vehicle continued making the noise. No lights were illuminated on the dash. Then, while still on the mountain, there was a loud "pop", smoke could be seen in the rear view mirror, and the engine died; I coasted to the side of the road. The car behind me pulled over and the driver yelled that my car was on fire. Flames could be seen under the car. The fire spread and ultimately the car exploded, setting the hillside on fire. The fire department extinguished the fire and the car was towed away. |
| Hyundai Sonata | 2015 | While driving the car started to putter and then stalled while on the way to work. The vehicle engine is shot I am told by the mechanic I have used for |

10 years now. Called the dealership about the issue and was advised I could have it towed in at my expense and have them look at it at my expense since the car is out of warranty. The dealership I am sure will say it is not due to faulty parts or any error on their part and I will have to have the vehicle towed again so $120 for towing and $79.99 plus tax for their assessment of the vehicle just to be told it is not their problem but I don't have much other choice.

| | | |
|---|---|---|
| Hyundai Sonata | 2015 | Theta II 4 cylinder 2,4L engine 2015 Hyundai Sonata sport. Car started shaking and then stalled in the middle of a city street. This could have been on the freeway and caused a crash. The car smelt like something was burning, I had it towed to momentum Hyundai fairfield, ca. They are saying nothing is wrong with the car. |
| Hyundai Sonata | 2015 | Bought this car brand new and at 20,000 miles it all started to go down hill. My car shakes & stalls hesitates bad loss of power almost causing accidents on a daily basis. I have brought it to the dealer 5 times for the same complaint even left it there for 9 days still not fixed I have a $398 payment for a car I am afraid to drive. I will not put my children in the car I am that afraid of getting in an accident. Hyundai does nothing no one can fix it & everyone has the same complaint I do all over the internet. These cars need to be taken off the road before someone gets killed!!! I pay for a car that I keep parked thats insane!!! my car is unsafe and a road hazard and no one is doing anything for any of these people that have the same problem as me. I have even brought video footage to Hyundai and they just update my computers which makes is worse half the time. |
| Hyundai Sonata | 2015 | While driving on a main road in my city I accelerated and heard a banging noise in my engine, when I accelerated the noise got louder. Finally, the noise stopped and as I noticed the noise gone I also noticed I could no longer hear my engine. I tried to accelerate and my speedometer was completely frozen with the oil light, engine light, and battery light on. I was able to coast to a residential area where my car was picked up and towed. Fast forward a few days and Hyundai is now claiming that the engine failure is due to neglect as now they are requiring all maintenance records for my vehicle or my warranty is null. If I can't get my whole maintenance history then I was told that will be a real problem and my service may be denied! mind you, 2014 Sonatas were recalled due to their engine but I was assured the 2015 Sonatas have a different engine, different part. Please do your research and do not buy a Hyundai, they do not stand by their work. |

**C. Unrecalled Kia Sorentos from 2015 and 2016 are experiencing the same engine defect that led to the prior Sorento recall.**

79. In its 2017 recall, KMA recalled 165,918 Sorento SUVs containing 2.4L Theta II GDI engines for model years 2012 through 2014, which were produced between April 19, 2011 through February 10, 2014.

80. Though the Theta II Kia Sorentos for model years 2015 and 2016 have not been recalled, they are the subject of dozens of NHTSA complaints about engine knock, stalling, and engine failures.

| Model | MY | Complaint |
|---|---|---|
| Kia Sorento | 2016 | I was driving on rt 18 (hwy)in NJ, going approximately 71 mph when the engine sieged. I was able to put my hazards on and coast to the shoulder but had I just stopped, there would have been a horrific accident. The dealer service department advised that they found the oil to be a little dirty and that there were metal shavings found as well. It is my understanding that the metal shavings caused a major recall in 2014 and older Kia Sorento's. it appears to be the same issue as a previous recall for the 2014 and older model. |
| Kia Sorento | 2016 | I was driving my vehicle up a hill with my 2 young children and the car just turned off. I was unable to push the brake. No engine light or oil light or anything came on! drifted into a parking lot. It was 2 degrees out. One of the coldest days of the year. Towed the car to Kia. Gave them 3 or 4 receipt as for oil changes. They denied the engine for warranty! stating sludge in engine. The vehicle was just at the dealership 6 months ago for 6 recalls and they checked everything before I picked the vehicle up. Every where I look on the complaint forums is all about oil consumption problems and engine failures with these vehicles! wish I would have know this! I have no $ for a new engine. |
| Kia Sorento | 2016 | A part which was replaced during a recall, failed. The Kia dealership wants to charge me $800 to replace that part. Plus, not cover a car rental. I feel the charge is unjustified. The car hesitated and cut off 300 miles from my home. The check engine light came on, and I feared continuing to drive the car. |
| Kia Sorento | 2016 | While driving my vehicle turned off no indication of any kind on dash board just automatically turned off. |

| Kia Sorento | 2016 | The contact owns a 2016 Kia Sorento. While driving 5 mph, the vehicle stalled in the middle of an intersection. The contact lost all power to vehicle. The vehicle was not repaired. The manufacturer was not made aware of the issue. The failure mileage was 6,300. |
|---|---|---|
| Kia Sorento | 2015 | 2015 Kia Sorento. Consumer writes in regards to engine issues. The consumer stated the engine seized due to a sludge build-up inside the valve cover. |
| Kia Sorento | 2015 | Todays date: 12/21/2017. Purchased vehicle 11/9/2017. Approx. 61,500 miles. I check equipment fluids regularly. While driving, the oil indication light illuminated. I pulled over, checked. Almost bone dry. No forewarning of any kind. The dealer serviced it prior to my purchase, so, I have had no reason to schedule vehicle service yet. Vehicle was manufactured March 5, 2014 ( 3/5/2014 ). |
| Kia Sorento | 2015 | The contact owns a 2015 Kia Sorento. While driving approximately 65 mph, the check engine and check oil warning indicators illuminated. The vehicle started to slowly decelerate until it stalled. The vehicle was towed to the dealer (parkside Kia in knoxville, Tennessee) where it was diagnosed that the engine seized because of sludge, and a new engine was needed. The vehicle was not repaired. The manufacturer was notified of the failure. The approximate failure mileage was 61,000. |
| Kia Sorento | 2015 | My husband took a position working approximately 2.5 hours away from our home and making a daily commute of 5 hours each day to work. We have never had any trouble out of our Sorento. In Saturday, October 14, 2017 after a long day at work he was traveling home and was about 1.75 hours into his 2 hour commute when our Sorento started making a terrible knocking noise. No light indicators came on to indicate what could possible be going wrong at the time. He got over in the slow lane and dropped his speed to approximately 30mph. Before every trip he made a point to check the oil and that morning was no diffetent. All oil levels were fine. After a few minutes the oil light came on. He got off at the next exit and put in around 1 quart of oil.. still no lights but the terrible knocking noise coninured. He sat for a bit and let the new oil run through and started to make his way home at which time the engine light and the oil light came on. He then pulled over and called a tow truck and had our car towed home. Our engine is completely blown. Upon starting it makes a terrible knocking noise and after 15 to 20 seconds turns off. A mechanic checked our car over and said there was metal shavings in our oil. We have contacted Kia but they we are not willing to do anything as we did not get all services and oil changes at the dealership. |

| Kia Sorento | 2015 | I experienced a sudden engine failure on August 27, 2017 on my 2015 Kia Sorento LX with 28K miles. The engine type is a theta II 2.4L gdi. The complete engine failure happened without warning while driving 65 mph on an interstate. The car immediately lost all acceleration capabilities. There were no warning displays or unusual noise/movement beforehand. It was a very dangerous situation and fortunately I was able to get to the shoulder and avoid any severe safety issues. The car was towed for a nearby Kia dealership in New Jersey and they diagnosed the engine failure. Kia has acknowledged this engine problem and they paid for a remanufactured engine and car rental costs for a nearly two-week period. The newly installed engine is only under warranty for 10 years from the original purchase date, not the date of the remanufactured engine installation. The car's service has been up to date and I had no previous issues with the car. Why has this engine problem not yet been recalled for 2015 Sorentos" it's likely a very similar problem to the Kia engine recalls earlier this year. The Kia dealership in New Jersey indicated that they replace dozens of new engines a month, including on many new 2017 and even 2018 models. Does someone need to be killed for action to be taken. |

## VII. The Class Vehicles' Written Warranties and Defendants' Warranty Practices

81.     Kia issued two relevant warranties covering each Class Vehicle and each Class Vehicle's powertrain.

82.     Under the basic New Vehicle Limited Warranty, Kia promised to repair defects reported within the earlier of 5 years or 60,000 miles.

83.     Under the Powertrain Warranty, Kia promised to repair defects affecting various powertrain components through 10 years and 100,000 miles, including, in relevant part, the following engine components: cylinder block, cylinder head and all internal parts, timing gear, seals and gaskets, valve cover, flywheel, oil pump, water pump and turbo charger. The powertrain warranty also covered components in the Class Vehicle's transaxle and transmission.

84.     Hyundai offered functionally identical warranty coverage for Hyundai Class vehicles.

24

85.     Kia routinely evades its warranty obligations when faced with complaints about the Defect by failing to tell consumers that their vehicles are defective and by representing that: (1) the engine knock symptom of the Defect is normal and does not merit diagnosis or repairs; and (2) the cause of engine failures from the Defect is the owner's neglect to properly maintain the engine oil and/or engine oil level or their use of aftermarket filters.

86.     Defendants routinely deny warranty repairs for Class Vehicle owners or lessees who reported Defect symptoms during the warranty period but had their Theta II engines fail from the Defect outside of the warranty period.

87.     In addition, Defendants have also evaded their warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including a mandate that all oil changes be completed at a Kia or Hyundai dealership, before determining whether to make the necessary repairs under warranty. However, Defendants know that the defect in the Class Vehicles' engines manifests even if the owner or lessee has followed the Defendants' oil change guidelines. Moreover, even if consumers produce their vehicles' maintenance history, Defendants may still blame the engine failure on the consumer, refusing to cover the necessary repairs under warranty, and charging as much as $10,000 to repair/replace the engine.

88.     In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the Defect (despite such defect having been contained in the Class Vehicles when manufactured by Defendants), repair and replacement of the Theta II Engine, and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components.

89.     Defendants have concealed the Defect because the information is material to the decision whether to purchase one of their vehicles. This deceptive practice has occurred in spite of the legal and equitable duties imposed on the Defendants to inform vehicle owners and prospective purchasers of the Defect. Defendants knowingly and intentionally concealed material information about the Defect with the intent that Plaintiff and the Class members would rely on the concealment and purchase the Class Vehicles.

**CLASS ALLEGATIONS**

90.     Plaintiffs bring this lawsuit on behalf of themselves and all similarly situated individuals and entities, pursuant to Fed. R. Civ. P. 23.  The proposed Class is defined as follows:

**Class**
All persons in Illinois who are current or former owners or lessees of Class Vehicles with Theta II engines that were not recalled in Hyundai's September 10, 2015 recall, Hyundai's March 31, 2017 recall, or Kia's March 31, 2017 recall.

91.     The Class excludes the following: Defendants, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case.  Plaintiff reserves the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

92.     *Numerosity*: The Class is so numerous that joinder of all members is impracticable. At least thousands of Class members have been subjected to Defendants' conduct. The class is ascertainable by reference to records in Defendants' possession.

93.     *Predominance*: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting individual members of the Class and include:

    a.     Whether the Class Vehicles were sold with a defect;

26

b.      Whether Defendants knew of the defects;

c.      Whether Defendants failed to disclose the defects;

d.      Whether Defendants actively concealed the defects;

e.      Whether a reasonable consumer would consider the defect or its manifestation to be material;

f.      Whether Defendants breached express warranties;

g.      Whether Defendants must disclose the Defect; and

h.      Whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, and the other claims asserted herein.

94.      *Typicality*: Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Defendants' conduct in designing, manufacturing, marketing, advertising, warranting, and selling the Class Vehicles. All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all Class members were injured in the same manner by Defendants' uniform course of conduct described herein. Plaintiff and all Class members have the same claims against Defendants relating to the conduct alleged herein, and the same events giving rise to Plaintiff's claims for relief are identical to those giving rise to the claims of all Class members. Plaintiff and all Class members sustained economic injuries including, but not limited to, ascertainable losses arising out of Defendants' course of conduct as described herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all absent Class members.

95. *Adequacy*: Plaintiff will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, breaches of warranties, product liability, product design defects, and state consumer fraud statutes.

96. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable, and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

97. *Manageability*: Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action and has plead an appropriately narrowed statewide class.

98. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS**

99.     Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

100.     Defendants are estopped from relying upon any statutes of limitation by reason of their fraudulent misrepresentation, suppression and concealment of material facts, and any applicable statutes of limitation are tolled by such conduct.

101.     Defendants did not inform Plaintiff or Class Members about the defect inherent in class vehicles, even though Defendants knew about the defect at the time of purchase.

102.     When Plaintiff and Class Members required replacement of engines due to the Defect, Defendants misrepresented to Plaintiff and Class Members that the engine failed, for example, as a result of inadequate maintenance or the use of aftermarket oil filters. Defendants also declined to cover the defect under warranty, for example, by arguing that the owner did not maintain the vehicle and that regular maintenance could have prevented the failure when, in fact, the failure was caused by an inherent defect.

103.     As a result of Defendants' omissions and misrepresentations, Plaintiff and the Class Members did not know about the Defect inherent in their Vehicles.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT 1**</u>
**VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILCS 505/1, *et seq*.)**
**(On behalf of the Class)**

104.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

105.     Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

106.     Plaintiff and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

107.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

108.     Defendants engaged in in unfair and deceptive acts in violation of the Illinois CFA through the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem).

109.     Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business within the course of trade or commerce in the State of Illinois, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

110.     Defendants knew that the Class Vehicles and Theta II Engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

111.     Defendants were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles:

a.     Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

b.     Plaintiff and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defect until manifestation of the defect;

c.     Defendants knew that Plaintiff and the Class Members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect; and

d.     Defendants actively concealed the safety defect and the associated repair costs by asserting to Plaintiff and Class Members that the cause of their engine problems was the result of Plaintiffs' and the Class Members' inability to maintain the proper engine oil levels despite knowing the repairs needed to correct the defect.

112.     In failing to disclose the Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty to disclose.

113.     The facts concealed or not disclosed by Defendants to Plaintiff and the Class Members are material in that a reasonable consumer would have considered them to be

31

important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiff and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

114.    Defendants acted unscrupulously in a manner that is substantially injurious to consumers. Among other things:

      a.      Marketed the Class Vehicles with actual or constructive knowledge of the Defect;

      b.      Marketed and sold Class Vehicles whose failures pose safety risks as well as irreparable and costly damages to the Vehicles' engines;

      c.      Replaced defective Theta II engines with equally defective engines; and

      d.      Refused to repair Class Vehicles with engines that failed because of the Defect.

115.    Defendants' acts and practices are contrary to Illinois law and policy and constitute unreasonable and oppressive business practices that caused substantial injury to Smolek and Class members.

116.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

117.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Class seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent.

118.     Plaintiff also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1, *et seq.*

**COUNT 2**
**BREACH OF EXPRESS WARRANTY**
**(810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)**
**(On behalf of the Class)**

119.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

120.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

121.     With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

122.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

123.     Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

124.     The engine parts affected by the Defect were distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided to all purchasers and lessors of Class Vehicles.

125.     Defendants breached these warranties by selling and leasing Class Vehicles with the Defect, requiring repair or replacement within the applicable warranty periods, and

refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

126.    Affording Defendants further reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. Plaintiff notified Kia of the breach within a reasonable time, though she was not required to do so. Defendants also knew of the Defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

127.    Also, as alleged in more detail herein, at the time the Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

128.    As a direct and proximate cause of Defendants' breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the defective connecting rod bearings and insufficient engine oil lubrication systems.

129.    Defendants' attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

130.    Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

34

131.    The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and the Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and that their engines would fail well before their useful lives.

132.    Plaintiff and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

**COUNT 3**
**BREACH OF WRITTEN WARRANTY UNDER THE**
**MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, et seq.)**
**(On behalf of the Class)**

133.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

134.    Plaintiff brings this claim on behalf of herself and on behalf of the Class. Plaintiff and the Class are "consumers" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(3).

135.    Each Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

136.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

137. Defendants' warranties for the Class Vehicles are "written warranties" within the meaning of 15 U.S.C. §2301(6).

138. Defendants breached their express warranties by:

a. Providing a 10 year/100,000 mile Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b. Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c. Refusing or failing to honor its express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the Defect.

139. Plaintiff and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

140. Defendants' breach of the express warranties has deprived Plaintiff and the other Class Members of the benefit of their bargain.

141. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

142.    Defendants have been afforded reasonable opportunities to cure its breaches of the written warranties and/or Plaintiff and the other Class Members were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranties would have been futile. Defendants were also on notice of the alleged defect from the complaints and service requests it received from Plaintiff, Class Members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

143.    As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiff and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory fees and/or other relief as deemed appropriate.

### COUNT 4
**FRAUD**
**(On behalf of the Class)**

144.    Plaintiff incorporates by reference all preceding paragraphs as though full set forth herein.

145.    Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent Defect with the Theta II Engine, which was not readily discoverable until years later, often after the New Vehicle Limited Warranty or the Powertrain Warranty has expired. As a result, Plaintiff and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defect and all the resultant problems.

146.     These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and the Class Members rely on them.

147.     Plaintiff and the Class Members reasonably relied on these omissions and suffered damages as a result.

### COUNT 5
### UNJUST ENRICHMENT
### (On behalf of the Class)

148.     In the alternative to breach of contract, Plaintiff, individually and for the Class, hereby incorporates the foregoing allegations as though fully set forth herein.

149.     Defendants knew or should have known that Plaintiff and the Class paid for the Class Vehicles with the expectation that they would perform as represented.

150.     Plaintiff and the Class conferred substantial benefits on Defendants by purchasing the defective Class Vehicles. Defendants knowingly and willingly accepted and enjoyed those benefits.

151.     Defendants' retention of these benefits is inequitable.

152.     As a direct and proximate cause of Defendants' unjust enrichment, Plaintiff and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, prays for a judgment against Defendants as follows:

A.     For an order certifying the Class, appointing Plaintiff as Representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class;

B.     For a declaration that the engines in Class Vehicles are defective, the remedial work necessary to correct the defective Theta II engines is covered by the Warranty, and the Warranty fails of its essential purpose;

C.     For compensatory damages and/or restitution or refund of all funds acquired by Defendants from Plaintiff and Class members as a result of Defendants' unlawful, unfair, deceptive and unconscionable practices described herein and in the consumer protection statutes of Illinois including actual and/or statutory and/or punitive damages and/or trebled damages to the extent permitted by law in an amount to be proven at trial;

D.      Payment of costs and expenses of suit herein incurred;

E.     Both pre-and post-judgment interest on any amounts awarded;

F.     Payment of reasonable attorneys' fees and expert fees;

G.     Punitive damages where available; and

H.     Such other and further relief as the Court may deem proper.


### DEMAND FOR JURY TRIAL

Plaintiff and the Class hereby demand trial by jury of all issues triable by right.


Respectfully submitted,


By: /s/ Stacy M. Bardo
One of Plaintiff's Attorneys

Jason S. Rathod *(will seek pro hac vice admission)*
Nicholas Migliaccio *(will seek pro hac vice admission)*
Esfand Nafisi *(will seek pro hac vice admission)*
Migliaccio & Rathod LLP
412 H. St. NE, Suite 302
Washington, D.C. 20002

Tel: (202) 470-3520

Stacy M. Bardo (stacy@bardolawpc.com)
Bardo Law, P.C.
22 West Washington Street, Suite 1500
Chicago, Illinois 60602
Tel: (312) 219-6980
Fax: (312) 219-6981